# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JERALD LENTINI, *et al.*,                    *
                                             *
            Plaintiffs,                      *
                                             *
     v.                                      *
                                             *
DEPARTMENT OF GOVERNMENT                     *
EFFICIENCY                                   *
and                                          *
OFFICE OF MANAGEMENT AND                     *
BUDGET                                       *
and                                          *
OFFICE OF PERSONNEL                          *     Civil Action No. 1:25-cv-00166 (JMC)
MANAGEMENT                                   *
and                                          *
EXECUTIVE OFFICE OF THE                      *
PRESIDENT                                    *
and                                          *
ELON MUSK                                    *
and                                          *
RUSSELL VOUGHT                               *
and                                          *
CHARLES EZELL, in his official capacity      *
as Acting Director of the Office of          *
Personnel Management,                        *
and                                          *
DONALD TRUMP,                                *
                                             *
            Defendants.                      *
                                             *
*     *     *     *     *     *     *     *     *     *     *     *     *

## FIRST AMENDED COMPLAINT

Plaintiffs Jerald Lentini, Joshua Erlich, and National Security Counselors, Inc., bring this

action against Defendants pursuant to the Federal Advisory Committee Act ("FACA"), 5 U.S.C.

app. 2 §§ 1-16, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, the

Mandamus Act, 28 U.S.C. § 1361, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and

the All Writs Act, 28 U.S.C. § 1651. Plaintiffs seek mandamus relief compelling Defendants to

comply with the nondiscretionary requirements of FACA, a declaration that Defendants have

violated FACA, and other declaratory and injunctive relief which would have the effect of

prohibiting Defendant Department of Government Efficiency ("DOGE") from operating

further—and prohibit Defendants Office of Management and Budget, Office of Personnel

Management, and Executive Office of the President from interacting with DOGE—until DOGE

has complied with FACA.

## JURISDICTION

1.      This Court has both subject matter jurisdiction over this action and personal

jurisdiction over Defendants pursuant to 5 U.S.C. § 704 and 28 U.S.C. §§ 1331, 1361.

## VENUE

2.      Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Jerald Lentini ("Lentini") is a U.S. citizen and a resident of the state of

Connecticut.

4.      Plaintiff Joshua Erlich ("Erlich") is a U.S. citizen and a resident of the

Commonwealth of Virginia.

5.      Plaintiff National Security Counselors, Inc. ("NSC") is a non-profit public interest

law firm incorporated in 2010 in the Commonwealth of Virginia as a tax-exempt charitable

organization. Since 2009, NSC has represented federal employees (including national security

employees) in administrative and litigation matters, as well as engaging in litigation and public

advocacy related to national security, accountability, and transparency.

6.      Lentini, Erlich, and NSC have a direct interest in the integrity, balance, and

legitimacy of DOGE, and in preventing the proposal or enactment of any policies that would

adversely affect federal employees (including national security employees), unions, government accountability, or transparency.

7.      DOGE is an advisory committee established by Vivek Ramaswamy ("Ramaswamy") and Defendants Elon Musk ("Musk") and President-Elect Donald Trump on 12 November 2024 and subsequently and continuously utilized by Defendants Office of Management and Budget ("OMB"), Office of Personnel Management ("OPM"), and Executive Office of the President ("EOP") beginning at 12:00 PM on 20 January 2025. Upon information and belief, DOGE—as referred to herein—is separate and distinct from the United States DOGE Service ("USDS"), which President Donald Trump established as a temporary agency within the Executive Office of the President on 20 January 2025, to be headed by the United States DOGE Administrator. The degree of overlap between DOGE and USDS is unclear, but, upon information and belief, it is not total.

8.      Defendant OMB is a federal agency which utilizes DOGE. DOGE is subject to oversight by OMB employees, who exercise decisionmaking authority over matters related to DOGE's work.

9.      Defendant OPM is a federal agency which utilizes DOGE. DOGE is subject to oversight by OPM employees, who exercise decisionmaking authority over matters related to DOGE's work.

10.     Defendant EOP is a Federal Government office which utilizes DOGE. DOGE is subject to oversight by EOP employees, who exercise decisionmaking authority over matters related to DOGE's work.

11.     Defendant Musk was Co-Chair of DOGE on 19 January 2025. Upon information and belief, he is still in charge of DOGE. Upon information and belief, he is not the United

States DOGE Administrator. He is being sued in his official capacity as the person in charge of DOGE only.

12.    Defendant Russell Vought ("Vought") is the Director of OMB. He exercises decisionmaking authority over matters related to DOGE's work. He is being sued in his official capacity only.

13.    Defendant Charles Ezell ("Ezell") is, as of this writing, the Acting Director of OPM. He exercises decisionmaking authority over matters related to DOGE's work. He is being sued in his official capacity only.

14.    Defendant Trump is the President of the United States. As head of the Executive Office of the President and the Executive Branch, Trump exercises decisionmaking authority over matters related to DOGE's work. He is being sued in his official capacity only.

## BACKGROUND

### *PART I: STATUTORY AND REGULATORY FRAMEWORK*

15.    FACA was intended to address congressional concerns with the growing number and use of advisory committees. Congress found, among other things, that committees "should be established only when they are determined to be essential" and that "Congress and the public" should be kept abreast of their activities. "FACA's principal purpose was to establish procedures aimed at enhancing public accountability of federal advisory committees."

16.    FACA applies to "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . established or utilized by one or more agencies . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government," denominating such groups as "advisory committees."

17.     Only those committees which are "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or "created by the National Academy of Sciences or the National Academy of Public Administration" fall outside the definition of "advisory committee" under the Act.

18.     All of the provisions of FACA apply to advisory committees except when an "Act of Congress establishing any such advisory committee specifically provides otherwise."

19.     FACA requires "the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and "that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."

20.     FACA's implementing regulations, promulgated by the General Services Administration ("GSA"), require each advisory committee to have a plan to attain fairly balanced membership. The plan must "ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee. Advisory committees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed."

21.     The charter of each advisory committee must be filed by the "Committee Management Officer designated in accordance with section 8(b) of the Act, or . . . another agency official designated by the agency head."

22.     No advisory committee "shall meet or take any action until an advisory committee charter has been filed with . . . the head of the agency to whom any advisory committee reports

and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." The advisory committee charter must also be filed with the Library of Congress and the GSA Committee Management Secretariat.

23.     Each advisory committee must also have a Designated Federal Officer ("DFO") designated by the agency head. A committee's DFO is responsible for calling meetings of the committee, approving the agenda for all committee meetings, attending meetings, adjourning any meeting when they determine it to be "in the public interest," and chairing the meeting when directed by the agency head.

24.     FACA demands transparency in the procedures and meetings of advisory committees. All advisory committee meetings must be open to the public and must be timely noticed in the Federal Register. Meetings must be noticed in the Federal Register at least fifteen days before the meeting is to be held.

25.     Interested members of the public must "be permitted to attend, appear before, or file statements with any advisory committee," subject only to "reasonable" regulations set by the Administrator of General Services. Although portions of meetings may be closed where the President determines that closure is provided for pursuant to 5 U.S.C. § 552b(c) (the federal Open Meetings statute), any such determination must be made in a writing that sets forth the reasons for the conclusion.

26.     Each advisory committee meeting must be "held at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." If an advisory committee meeting is held via teleconference, videoconference, or other electronic medium, it still must be made accessible to the public.

27.     Subject to the provisions of the Freedom of Information Act, 5 U.S.C. § 552, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports."

28.     FACA mandates that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified to by the chairman of the advisory committee." Advisory committees must make available copies of transcripts of advisory committee meetings to "any person" at only the "actual cost of duplication."

29.     These requirements reflect FACA's goal of ensuring that "agencies should seek to be as inclusive as possible."

30.     Each of the requirements of FACA is mandatory on the officials utilizing the advisory committee—in this case Vought, Ezell, and Trump—and on the advisory committee itself.

## *PART II: DOGE'S ESTABLISHMENT AND ADVISORY ROLE*

31.     On 19 August 2024, after a campaign event in Pennsylvania, Candidate Trump was asked if would consider an administration position for Musk if elected. Candidate Trump replied, "I certainly would, if he would do it, I certainly would. He's a brilliant guy." That evening, Musk replied from a personal social media account, "I am willing to serve," along with an Artificial Intelligence-generated image of himself standing at a lectern labeled "D.O.G.E.

Department of Government Efficiency." This image is the earliest known use of "D.O.G.E." or reference to the "Department of Government Efficiency." The DOGE acronym is a tongue-in-cheek reference to Dogecoin, a cryptocurrency in which Musk has personally invested and which he regularly promoted on social media.

32.    On 12 November 2024, following his election victory, President-Elect Trump announced in a statement from his transition team, published on social media, that he intended to appoint Musk and former presidential candidate Vivek Ramaswamy to "lead the Department of Government Efficiency ('DOGE')," which he described as a new entity that would "provide advice and guidance from outside of Government" and would "partner with the White House and Office of Management & Budget to drive large scale structural reform, and create an entrepreneurial approach to Government never seen before." He further stated that he "look[ed] forward to Elon and Vivek making changes to the Federal Bureaucracy," and set a termination date of 4 July 2026 for this new advisory committee.

33.    On 14 November 2024, the @DOGE account posted a call on x.com for individuals to apply for membership in DOGE by sending a direct message to that account.

34.    On 17 November 2024, Ramaswamy appeared on the Fox Business Channel show *Sunday Morning Futures* and outlined the agenda for DOGE:

> First is, we want to go right in through executive action, to do the failures of the Executive Branch that need to be addressed. Because the dirty little secret right now, Maria, is the people we elect to run the Government, they're not the ones who actually run the Government. It's the unelected bureaucrats in the administrative state. That was created through executive action; it's going to be fixed through executive action . . . . We're not going to be cutting ribbons, we're going to be cutting costs. So [our] recommendations are going to be on a real-time basis . . . . Part of this is exposing for the public the extent of that rot and waste, but then to take steps, first, through executive action, and then laying the groundwork for broader change through legislation as well . . . . Historically, it's been the view of many scholars to say that those [Government employees] cannot even be fired. Now we take a different view with the environment the Supreme Court has given us in

recent years, and we're going to use that in a pretty extensive way, Maria, to move quickly.

35.    On 20 November 2024, Musk and Ramaswamy authored an opinion editorial in the *Wall Street Journal* in which they stated that "President Trump has asked the two of us to lead a newly formed Department of Government Efficiency, or DOGE, to cut the Federal Government down to size."

36.    Notwithstanding their claim that DOGE would be "[u]nlike government commissions or advisory committees"—demonstrating that they did not intend for DOGE to be governed by FACA—Musk and Ramaswamy further stated, "This team will work in the new administration closely with the White House Office of Management and Budget."

37.    Musk and Ramaswamy added, "DOGE will work with legal experts embedded in government agencies, aided by advanced technology, to apply [recent Supreme Court] rulings to federal regulations enacted by such agencies. DOGE will present this list of regulations to President Trump, who can, by executive action, immediately pause the enforcement of those regulations and initiate the process for review and rescission."

38.    Most relevant for this litigation, Musk and Ramaswamy then stated their intention to, through DOGE, effect "mass head-count reductions across the federal bureaucracy" through executive action:

> DOGE intends to work with embedded appointees in agencies to identify the minimum number of employees required at an agency for it to perform its constitutionally permissible and statutorily mandated functions. The number of federal employees to cut should be at least proportionate to the number of federal regulations that are nullified: Not only are fewer employees required to enforce fewer regulations, but the agency would produce fewer regulations once its scope of authority is properly limited. Employees whose positions are eliminated deserve to be treated with respect, and DOGE's goal is to help support their transition into the private sector. The president can use existing laws to give them incentives for early retirement and to make voluntary severance payments to facilitate a graceful exit.

Conventional wisdom holds that statutory civil-service protections stop the president or even his political appointees from firing federal workers. The purpose of these protections is to protect employees from political retaliation. But the statute allows for "reductions in force" that don't target specific employees. The statute further empowers the president to "prescribe rules governing the competitive service." That power is broad. Previous presidents have used it to amend the civil service rules by executive order, and the Supreme Court has held—in *Franklin v. Massachusetts* (1992) and *Collins v. Yellen* (2021) that they weren't constrained by the Administrative Procedures [sic] Act when they did so. With this authority, Mr. Trump can implement any number of "rules governing the competitive service" that would curtail administrative overgrowth, from large-scale firings to relocation of federal agencies out of the Washington area. Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome: If federal employees don't want to show up, American taxpayers shouldn't pay them for the Covid-era privilege of staying home.

39.     Other key political figures soon began supporting this new advisory committee. Speaker of the House Mike Johnson brought Musk and Ramaswamy to address a gathering of representatives at the Capitol on 5 December 2024, including members of the newly formed "DOGE Caucus," about their plans, posting on social media that "@HouseGOP is excited to work with @ElonMusk, @VivekGRamaswamy and @DOGE for a leaner, more efficient government." Musk and Ramaswamy held additional meetings on 5 December, including with Senator Marsha Blackburn, who posted on her social media account that they had discussed "how @DOGE will get its arms around our bloated federal government."

40.     Outside of Government, venture capitalists affiliated with the tech industry were brought into DOGE to assist with ramping up operations. In November 2024, Marc Andreessen ("Andreessen"), a venture capitalist and major donor to the Trump campaign, was brought on board to identify possible members.

41.     On 4 December 2024, President-Elect Trump posted on social media that he had personally "asked William Joseph McGinley to serve as Counsel to the Department of Government Efficiency ("DOGE"), something he is very passionate about." Trump added, "Bill

will work with Elon Musk, Vivek Ramaswamy, and their team of incredible pioneers at DOGE, to rebuild a U.S. Government that truly serves the People. . . . He will partner with the White House and the Office of Management and Budget to provide advice and guidance to end the bloated Federal Bureaucracy."

42.    Incoming Executive Branch personnel have also been keen to highlight their ideological affinity with DOGE. On 9 December 2024, after being announced by President-Elect Trump as his choice to serve as OMB General Counsel, Mark Paoletta posted on social media about how excited he was to help implement Trump's agenda, "including working w/ @DOGE to cut wasteful government spending!" Ramaswamy reposted Paoletta's comments an hour later, adding, "@MarkPaoletta will be a great partner to @DOGE within OMB."

43.    On 14 January 2025, Andreessen sat for an interview with a podcaster from the Hoover Institution, a right-wing think tank at Stanford University. In this interview, during a discussion of areas of federal employment practices—like telework and collective bargaining agreements—in which DOGE would be making recommendations, Andreessen acknowledged the advisory structure of DOGE:

> Andreessen: [D]oes the President of the United States have the legal authority to order people back to work? Does it count to be an employee of the Federal Government if you're not in the office? So there's a ton of threads like that that they're going to plan to . . . pull.
>
> Interviewer: All this is just beautiful, really, truly beautiful. However, DOGE is an advisory commission.
>
> Andreessen: Sure.
>
> Interviewer: I believe this is the way the President has set it up, as an advisory commission. It has its sunset date.
>
> Andreessen: Yes.
>
> Interviewer: It ends on July, or goes out of business on July 4, 2026.

Andreessen: That's right.

After a brief tangential discussion regarding impoundment, Andreessen concluded:

> Vivek and Elon are running it, and . . . it itself is not getting set up as a permanent agency. It doesn't have the authority to execute on everything that we're talking about, but the White House does, the Executive Branch does, and the President does. And it will be . . . , as it should be, it will be a decision of the President on what he wants to do with these recommendations. Um, you know, the people being staffed into the positions, . . . so the new head of OMB, is very, you know, has talked about being very aligned with this, The new head of OPM is actually a partner of ours who's going in there, he's very aligned with this.

44.    On 10 January 2025, the *Washington Post* reported, citing "people familiar with the matter," "In recent days, aides with the nongovernmental 'Department of Government Efficiency' tied to President-elect Donald Trump's transition team have spoken with staffers at more than a dozen federal agencies . . . . The agencies include the Treasury Department, the Internal Revenue Service and the departments of Homeland Security, Veterans Affairs, and Health and Human Services."

45.    On 12 January 2025, the *New York Times* reported, citing "people who have insight into DOGE's operations," "The goal is for most major agencies to eventually have two DOGE representatives." This report added that "the minority of people not detailed to agencies would be housed within the Executive Office of the President at the U.S. Digital Service" and that "DOGE is also expected to have an office in the Office of Management and Budget."

46.    This report also noted, "People involved in the operation say that secrecy and avoiding leaks is paramount, and much of its communication is conducted on Signal, the encrypted messaging app."

47.    This claim is supported by a public blog post by Vinay Hiremath, who worked with DOGE for four weeks in November and December:

After 8 calls with people who all talked fast and sounded very . . . smart, I was added to a number of Signal groups and immediately put to work. . . . Within 2 minutes of talking to the final interviewer for DOGE, he asked me if I wanted to join. I said "yes"'. Then he said "cool" and I was in multiple Signal groups. I was immediately acquainted with the software, HR, and legal teams and went from 0 to 100 taking meetings and getting shit done. This was the day before Thanksgiving.

The next 4 weeks of my life consisted of 100s of calls recruiting the smartest people I've ever talked to, working on various projects I'm definitely not able to talk about, and learning how completely dysfunctional the government was.

48.    On 13 January 2025, the *New York Times* reported that Musk was likely to occupy an office in the Eisenhower Executive Office Building, part of the White House Complex.

### *PART III: DEMOGRAPHICS OF DOGE'S MEMBERSHIP*

49.    Due to DOGE's lack of transparency, little is publicly known about its structure or membership.

50.    From the outset, Musk and Ramaswamy stated their intentions to only select DOGE members who adhere to a particular philosophy, and the known members all share similar characteristics which reflect a particular background.

51.    The 14 November 2024 social media post from @DOGE specifically stated, "We need super high-IQ small-government revolutionaries willing to work 80+ hours per week on unglamorous cost-cutting."

52.    Musk and Ramaswamy's 20 November 2024 opinion editorial stated, "We are assisting the Trump transition team to identify and hire a lean team of small-government crusaders, including some of the sharpest technical and legal minds in America."

53.    The 12 January 2025 *New York Times* report revealed, "Many of the executives involved are expecting to do six-month voluntary stints inside the federal government before returning to their high-paying jobs."

54.    This report also revealed details about the distinctly arbitrary selection process:

Mr. Musk's friends have been intimately involved in choosing people who are set to be deployed to various agencies. Those who have conducted interviews for DOGE include the Silicon Valley investors Marc Andreessen, Shaun Maguire, Baris Akis and others who have a personal connection to Mr. Musk. Some who have received the Thiel Fellowship, a prestigious grant funded by Mr. Thiel given to those who promise to skip or drop out of college to become entrepreneurs, are involved with programming and operations for DOGE. Brokering an introduction to Mr. Musk or Mr. Ramaswamy, or their inner circles, has been a key way for leaders to be picked for deployment.

55.    As revealed in the 10 January 2025 *Washington Post* report revealed, DOGE is continuing to select members through an opaque and arbitrary process:

Musk and Ramaswamy have significantly stepped up hiring for their new entity, with more than 50 staffers already working out of the offices of SpaceX, Musk's rocket-building company, in downtown Washington, two of the people said. DOGE aims to have a staff of close to 100 people in place by Trump's inauguration on Jan. 20, they said.

56.    Through various reports, it is possible to identify numerous individuals in addition to Musk and Ramaswamy who have been affiliated with DOGE in some fashion.

57.    Of these DOGE associates, a significant percentage have been senior corporate executives or venture capitalists affiliated with the tech industry. Several were affiliated with the previous Trump administration or the Trump campaign. Several others have a personal relationship with Musk or Ramaswamy.

### PART IV: DOGE'S LACK OF REPRESENTATION

58.    Upon information and belief, not a single member of DOGE represents the perspective of federal employees, despite the evidence that DOGE considers looking for federal employment practices and ways to reduce the size of the federal workforce as part of its mandate.

59.     Upon information and belief, not a single member of DOGE is a member of a union or represents the perspective of unions, despite the evidence that DOGE will be evaluating collective bargaining agreements.

60.     Upon information and belief, not a single member of DOGE has experience working on matters of national security or representing people who do, despite the evidence that DOGE considers agencies in this field to be within its jurisdiction.

61.     Upon information and belief, not a single member of DOGE has experience advocating for greater accountability and transparency in the Federal Government, despite the evidence that DOGE intends to keep its deliberations and activities secret.

62.     To remedy this imbalance, Lentini and Erlich requested appointment to DOGE.

63.     Lentini has been a lawyer for thirteen years. He holds a bachelor's degree from New College of Florida, a Master of Business Administration from Louisiana State University Shreveport, and a law degree from Georgetown University.

64.     Since graduating from law school, Lentini has worked in various capacities for a wide array of employers, including the AFL-CIO, the Connecticut state government, and NSC. He is a local elected official in Manchester, CT, a community of 60,000 residents.

65.     In his application to DOGE, Lentini stated that he was applying for membership "in the hopes that true governmental waste may be cut without sacrificing the dedicated and competent federal workers who spend every day serving their country." He added, "I am deeply concerned that the D.O.G.E. may be bereft of staff—and leadership—who understand and prioritize the considerations of the civil servants whose lives will be most directly impacted by proposed reforms. As a proud member of AFSCME Local 2663, I hope to ensure that these

workers' livelihoods are not capriciously upended by those whose expertise and sympathies lie elsewhere."

66.     Lentini's application emphasized his experience working for a state government agency "help[ing] [to] protect the rights and interests of private and public sector employees" and his experience working for NSC—which he described as "a public interest non-profit firm that specializes in holding federal agencies to account on matters of transparency and civil rights"—in a case "to determine if hostile foreign actors were attempting to expose domestic intelligence assets or if intelligence workers were engaged in prohibited activity."

67.     Lentini elaborated on his public service and budget bona fides: "In the past year, I have helped cut over $2.1 million in planned spending from our municipal budget of nearly a quarter-billion dollars, ensuring that critical services continue to be provided while protecting taxpayers' money," concluding that his "practical experience in balancing the needs of effective government and fiscal responsibility would be invaluable to an advisory body."

68.     If selected for DOGE, Lentini would represent the perspectives of federal employees (including national security employees), unions, and accountability and transparency advocates.

69.     Erlich has been a lawyer for fourteen years. He holds a bachelor's degree from Louisiana State University and a law degree, master of laws (taxation) degree, and employee benefits law certificate from Georgetown University.

70.     Erlich is the principal attorney at The Erlich Law Office, PLLC, an employment law firm which regularly represents federal employees, and has appeared in more than two hundred federal cases. Erlich also regularly practices before the Equal Employment Opportunity Commission representing federal employees in every stage of the process.

16

71.    In his application to DOGE, Erlich described his focus on civil rights, discrimination, employment, and harassment issues and stated that he was applying for membership because "[t]o my knowledge, DOGE does not currently have an individual who will speak on behalf of government workers and their interests." He added, "The ineffective and inefficient government practices in federal sector employment law are substantial. Taxpayer funds are regularly wasted as government counsel engages in unnecessary and wasteful litigation practices."

72.    Erlich's application further emphasized his experience working on both sides of the issues likely to be reviewed by DOGE: "I have also represented clients with claims of insufficient, fraudulent, or illegal government practices . . . . Finally, as someone who also represents business in the private sector, I understand the importance of efficient work."

73.    If selected for DOGE, Erlich would represent the perspective of federal employees.

74.    As of this writing, neither Lentini nor Erlich have been contacted by DOGE in response to their applications.

75.    Other individuals affiliated with several prominent non-profit organizations focused on federal employment, accountability, and transparency issues have also applied to DOGE without success.

76.    In light of the reports of DOGE's efforts to select members quickly, Plaintiffs conclude that, upon information and belief, neither Lentini nor Erlich, nor anyone similarly situated who would represent the perspectives of federal employees (including national security employees), unions, or accountability and transparency advocates, will be selected for DOGE.

77.    Section 5(b) of FACA requires that any advisory committee, including DOGE, (i) be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," (ii) "not be inappropriately influenced by the appointing authority," and (iii) "not be inappropriately influenced . . . by any special interest."

78.    DOGE's stacked membership, far from being fairly balanced, reveals that only one viewpoint is represented: that of "small-government crusaders" with backgrounds in either the tech industry or Republican politics. This shortcoming renders DOGE's membership imbalanced and unfit for the function is has been directed to perform.

79.    To have a fair balance of viewpoints and competent deliberations, there must be representatives not only from the world of corporate management and political activists united in a mission to cut government spending by any means necessary, but also from people who will represent the perspectives of government employees and accountability and transparency advocates.

80.    Further, Vought, Ezell, and President Trump have an inappropriate degree of influence on DOGE. This has been made clear, for example, in President-Elect Trump's "selection" of McGinley to be DOGE General Counsel, and in Andreessen's statement that Vought and President Trump's nominee for OPM Director are "very aligned with this." In fact, President Trump took several official actions his first day in office which directly pertain to the issues DOGE is supposed to be studying and which demonstrate close coordination between DOGE and the presidential transition team

81.    Compounding these errors, DOGE has been and will continue to be inappropriately influenced by a variety of other special interests, such as Andreessen, who describes himself as "an unpaid intern." This influence reflects a "small-government"

perspective and suggests that DOGE should reach preordained conclusions with respect to the issues it is supposed to be studying. For example, the selection process for DOGE membership involves personal friends of Musk and Ramaswamy who do not hold any official position within DOGE yet play a critical role in selecting members.

82.     Based on the statements of Musk, Ramaswamy, and President-Elect Trump, DOGE was created with an anticipated outcome. For the purposes of this litigation, the intended goal is clear: recommendations made by unaccountable outsiders without transparent deliberations which will reduce the size of the federal workforce by whatever means necessary.

### *PART V: DOGE AND USDS ACTIVITIES SINCE 20 JANUARY*

83.     On 20 January 2025, President Trump issued Executive Order 14,158, entitled *Establishing and Implementing the President's "Department of Government Efficiency"* ("the Order" or "E.O. 14,158").

84.     The Order stated that the existing U.S. Digital Service, which was housed in OMB, was renamed the U.S. DOGE Service and moved to the EOP. According to the Order, the USDS Administrator—also referred to as the "Administrator of the Department of Government Efficiency" in other presidential documents—would be the head of USDS.

85.     The new mandate of USDS is:

> *Modernizing Federal Technology and Software to Maximize Efficiency and Productivity.* . . . The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems.  Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization.

86.      Since 20 January, numerous individuals claiming to be affiliated with DOGE have entered numerous government agencies, made numerous recommendations on numerous

19

topics to the leadership of those agencies and the White House, forced numerous career officials

out, and taken credit for "saving the Federal Government approx.. $1 billion/day, mostly from

stopping the hiring of people into unnecessary positions, deletion of DEI and stopping improper

payments to foreign organizations, all consistent with the President's Executive Orders."

Department of Government Efficiency (@DOGE), X.com (Jan. 28, 2025 7:20 PM), *at*

https://x.com/DOGE/status/1884396041786524032 (last accessed Feb. 12, 2025).

87.    Stopping the hiring of people into unnecessary positions is not related to

improving the quality and efficiency of government-wide software, network infrastructure, and

information technology (IT) systems.

88.    Deletion of DEI is not related to improving the quality and efficiency of

government-wide software, network infrastructure, and information technology (IT) systems.

89.    Stopping improper payments to foreign organizations is not related to improving

the quality and efficiency of government-wide software, network infrastructure, and information

technology (IT) systems.

90.    Musk consistently purports to be the head of DOGE, most recently speaking on its

behalf alongside President Trump in an Oval Office press conference on 11 February.

91.    Musk has also publicly made numerous statements about DOGE's activities

which are clearly based on non-public information, of which the following are a recent sample:

- "The @DOGE team just discovered that FEMA sent $59M LAST WEEK
  to luxury hotels in New York City to house illegal migrants. Sending this
  money violated the law and is in gross insubordination to the President's
  executive order. That money is meant for American disaster relief and
  instead is being spent on high end hotels for illegals! A clawback demand

will be made today to recoup those funds." Elon Musk (@elonmusk),

X.com (Feb. 10, 2025 5:03 AM), *at*

https://x.com/elonmusk/status/1888891512303263815 (last accessed Feb.

12, 2025).

- "The @DOGE team is rapidly shutting down these illegal payments."

  Elon Musk (@elonmusk), X.com (Feb. 2, 2025 3:14 AM), *at*

  https://x.com/elonmusk/status/1885964969335808217 (last accessed Feb.

  12, 2025).

92.    Making a clawback demand to recoup funds is not related to improving the

quality and efficiency of government-wide software, network infrastructure, and information

technology (IT) systems.

93.    Rapidly shutting down illegal payments is not related to improving the quality and

efficiency of government-wide software, network infrastructure, and information technology (IT)

systems.

94.    Musk consistently takes credit for DOGE's activities—often referring to DOGE

in the first-person plural tense—in public statements, of which the following are a recent sample:

- "They are hiding massive fraud and don't want their grift to end. This is

  how *we know we are over the target*. Everything @DOGE does will be

  published for the world to see. Let the public judge for themselves." Elon

  Musk (@elonmusk), X.com (Feb. 10, 2025 2:52 PM), *at*

  https://x.com/elonmusk/status/1889039856631787758 (last accessed Feb.

  12, 2025) (emphasis added).

- "Thanks." Elon Musk (@elonmusk), X.com (Feb. 9, 2025 5:49 PM), *at* https://x.com/elonmusk/status/1888721830711591419 (last accessed Feb. 12, 2025) (replying to a post stating "Man I knew @elonmusk would be effective with @DOGE").

- "Accurate. *We just renamed US Digital Services*, created by Obama, to US DOGE Services, with a mandate to modernize all computer systems in the US government. This is something that is sorely needed!" Elon Musk (@elonmusk), X.com (Feb. 5, 2025 10:10 AM), *at* https://x.com/elonmusk/status/1887156853315911817 (last accessed Feb. 12, 2025) (emphasis added).

- "If they want to cancel @DOGE in exchange for deleting everything in the federal government that isn't explicit law passed by Congress, *I would gladly take that deal!* But they would never do it. Not in a million years." Elon Musk (@elonmusk), X.com (Feb. 4, 2025 1:23 PM), *at* https://x.com/elonmusk/status/1886842910416535753 (last accessed Feb. 12, 2025) (emphasis added).

- "Only with public support can @DOGE succeed. The bad guys will do anything they can, legal or otherwise, *to stop us*." Elon Musk (@elonmusk), X.com (Feb. 3, 2025 2:59 AM), *at* https://x.com/elonmusk/status/1886323575524601955 (last accessed Feb. 12, 2025) (emphasis added).

- "DOGE is working 120 hour [sic] a week. *Our bureaucratic opponents* optimistically work 40 hours a week. That is why they are losing so fast."

Elon Musk (@elonmusk), X.com (Feb. 2, 2025 3:21 AM), *at*

https://x.com/elonmusk/status/1885966827227861179 (last accessed Feb.

12, 2025) (emphasis added).

95.     Despite purporting to be the head of DOGE, taking credit for its activities, and

making statements based on non-public information available to DOGE, Musk is not the USDS

Administrator. "A White House record seen by Business Insider says his job is simply 'unlisted.'

Though Musk has a White House access badge as of January 20 and has been widely described

as the leader of DOGE, the White House has not officially confirmed Musk's title." Jack

Newsham, *Elon Musk's newest job title is literally "unlisted"* Bus. Insider (Feb. 6, 2025),

*available at* https://www.businessinsider.com/elon-musks-job-title-unlisted-2025-2 (last

accessed Feb. 12, 2025).

96.     A 6 February Congressional Research Service report stated, "CRS is not aware

that a USDS administrator has been named publicly."

97.     All of these allegations are supported by the public statement that Sen. James

Lankford—a "founding member of the Congressional DOGE Caucus"—made on 21 January

2025, a day after President Trump established the U.S. DOGE Service in Executive Order

14,158: "DOGE is not a real department. It's an idea. It's an internal conversation within the

White House. It's Elon Musk actually trying to be able to drive a messaging piece to say, if we

are going to be better with our tax dollars, to literally waste less and then spend less as well, then

let's start this idea. The Legislative Branch has got a thing, Executive Branch has got a thing, go

do your thing." *Elon Musk's DOGE faces lawsuit minutes after inauguration* Fox News (Jan. 21,

2025), *available at* https://www.foxnews.com/video/6367443500112 (last accessed Feb. 13,

2025).

98.     A group of people having "an internal conversation within the White House . . . trying to be able to drive a messaging piece" led by a person who is not in charge of the relevant government office is an advisory committee subject to the requirements of FACA.

### *PART VI: OTHER FACA ISSUES FACING DOGE*

99.     Upon information and belief, a DFO has not been appointed for DOGE as required by FACA and there are no plans to do so.

100.     Upon information and belief, DOGE's staff has not been made public and there are no plans to do so.

101.     Upon information and belief, no Defendant has filed an advisory committee charter with any federal agency, any Congressional committee, the Library of Congress, or the GSA Committee Management Secretariat and there are no plans to do so.

102.     Upon information and belief, DOGE has been operating and holding meetings without a charter and will continue to do so.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (FACA/MANDAMUS – LACK OF FAIR BALANCE AND INAPPROPRIATE INFLUENCE)

103.     Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

104.     Upon information and belief, DOGE—the group established by Musk, Ramaswamy, and Trump in November 2024—continues to operate outside of USDS and has not been fully transformed into USDS.

24

105.    Musk continues to speak for DOGE and take credit for DOGE's activities, while not being the USDS Administrator.

106.    DOGE continues to take actions which are completely unrelated to the USDS mandate set forth in E.O. 14,158.

107.    Accordingly, DOGE is continuing to act as an advisory committee separate and distinct from USDS.

108.    DOGE was established to "provide advice and guidance from outside of Government" and "partner with the White House and Office of Management & Budget to drive large scale structural reform, and create an entrepreneurial approach to Government never seen before."

109.    Because DOGE is a "committee . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies of the Federal Government," it is an "advisory committee" as defined in FACA.

110.    DOGE does not satisfy the statutory criteria for exemption from FACA's requirements.

111.    Because DOGE is not exempted from FACA's requirements, it must be "fairly balanced in terms of the points of view represented and the functions to be performed."

112.    As set forth above, the known associates of DOGE are not fairly balanced in terms of their backgrounds and points of view on the issues being studied and addressed by DOGE.

113.    Further, to comply with FACA, committees have a nondiscretionary duty to "not be inappropriately influenced by the appointing authority or by any special interest."

114.   Defendants Vought, Ezell, and President Trump, as well as various special interests, have "inappropriately influenced" DOGE.

115.   Defendants' violations of FACA have injured Plaintiffs by limiting Plaintiffs' ability and right to have a representative voice on DOGE on issues with which Plaintiffs are engaged.

116.   These injuries to Plaintiffs are likely to continue as long as Defendants continue to operate and direct the operation of DOGE out of compliance with the law.

<u>SECOND CAUSE OF ACTION</u>

<u>(FACA/MANDAMUS – LACK OF CHARTER FILING)</u>

117.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1-88 set forth above.

118.   FACA states that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed with . . . the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency."

119.   DOGE has a nondiscretionary duty to file an advisory committee charter with the relevant federal agencies and Congressional committees prior to "meet[ing] or tak[ing] any action."

120.   DOGE has not filed an advisory committee charter with the relevant federal agencies and Congressional committees.

121.   FACA's implementing regulations further require that an advisory committee charter be filed with the Library of Congress and the GSA Committee Management Secretariat.

122.    DOGE has not filed an advisory committee charter with the Library of Congress or the GSA Committee Management Secretariat.

123.    DOGE actively meets and takes actions.

124.    Defendants' violations of FACA have injured Plaintiffs by limiting Plaintiffs' ability and right to intelligently advocate with or against DOGE on issues with which Plaintiffs are engaged.

125.    These injuries to Plaintiffs are likely to continue as long as Defendants continue to operate and direct the operation of DOGE out of compliance with the law.

**THIRD CAUSE OF ACTION**

**(FACA/MANDAMUS – LACK OF PUBLIC NOTICE AND ACCESS)**

126.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-88 set forth above.

127.    FACA requires that "[e]ach advisory committee meeting shall be open to the public."

128.    DOGE thus has a nondiscretionary duty to ensure its meetings are open to the public.

129.    Because DOGE has conducted hearings in person, remotely, and on the encrypted messaging app Signal without providing the public with the opportunity to participate or listen in, its hearings have not been "open to the public."

130.    FACA further requires that "timely notice of each such meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for other types of public notice."

131.    In order to provide "timely notice," DOGE's notice must be published in the Federal Registe at least 15 days prior to the hearing, and must include: (1) the name of the advisory committee; (2) the time, date, and place of the hearing; (3) a summary of the agenda and topics to be discussed; (4) a statement of whether any parts of the meeting will be closed, along with an explanation for such closure; and (5) contact information for a designated officer for those who wish to learn more information.

132.    DOGE has a nondiscretionary duty to public notice of its meetings and hearings in the Federal Register at least fifteen days prior to any such meeting or hearing.

133.    Defendants have failed to provide timely notice of any of DOGE's hearings.

134.    Defendants have failed to otherwise provide public notice of any kind for any of the hearings conducted to date.

135.    FACA also requires that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents prepared for or by [DOGE]" are "available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports."

136.    Defendants thus have a nondiscretionary duty to make all documents "available to or prepared for or by" DOGE, including meeting agendas, witness bios, hearing transcripts, and record evidence, available to the public.

137.    Defendants have failed to make all necessary documents publicly available.

138.    Defendants' violations of FACA have injured Plaintiffs by limiting Plaintiffs' ability and right to intelligently advocate with or against DOGE on issues with which Plaintiffs are engaged.

139.    These injuries to Plaintiffs are likely to continue as long as Defendants continue to operate and direct the operation of DOGE out of compliance with the law.

## FOURTH CAUSE OF ACTION

## (FACA/MANDAMUS – NO DESIGNATED FEDERAL OFFICER)

140.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-88 set forth above.

141.    FACA requires that Vought, Ezell, or President Trump, as head of the Government agency or office to which DOGE reports, "designate a Federal officer . . . to be the [Designated Federal Officer]" for DOGE.

142.    FACA forbids "any meeting in the absence of [a Designated Federal Officer]."

143.    FACA orders that "[a]dvisory committees shall not hold any meetings except at the call of, or with the advance approval of, a [Designated Federal Officer]."

144.    DOGE has no Designated Federal Officer, yet it meets and intends to meet again.

145.    Defendants' violations of FACA have injured Plaintiffs by limiting Plaintiffs' ability and right to intelligently advocate with or against DOGE on issues with which Plaintiffs are engaged.

146.    These injuries to Plaintiffs are likely to continue as long as Defendants continue to operate and direct the operation of DOGE out of compliance with the law.

## FIFTH CAUSE OF ACTION

## (FACA/APA – VARIOUS ISSUES)

147.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-88 set forth above.

148. FACA requires that Defendants Vought, Ezell, and/or President Trump ensure that the membership of DOGE is "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."

149. As set forth above, the known associates of DOGE are not fairly balanced in terms of their backgrounds and points of view on the issues being studied and addressed by DOGE

150. FACA requires that Defendants Vought, Ezell, and/or President Trump, as head of the Government agency or office to which DOGE reports, "designate a Federal officer . . . to be the [Designated Federal Officer]" for DOGE.

151. Defendants Vought, Ezell, and President Trump have not appointed a DFO for DOGE.

152. FACA requires that "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at . . . the agency to which the advisory committee reports until the advisory committee ceases to exist."

153. Defendants Vought, Ezell, and President Trump are (a) acting without observance of procedures required by law; and (b) acting in a manner that is arbitrary, capricious, and contrary to law, in violation of the APA.

154. Defendants' violations of FACA and the APA have injured Plaintiffs by limiting Plaintiffs' ability and right to have a representative voice on DOGE on issues with which Plaintiffs are engaged.

155. These injuries to Plaintiffs are likely to continue as long as Defendants continue to operate and direct the operation of DOGE out of compliance with the law.

30

156.    Each of these failures to comply with FACA's requirements constitutes final agency action under the APA.

## SIXTH CAUSE OF ACTION

## (FACA/DJA – FACA VIOLATIONS)

157.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-88 set forth above.

158.    Where statutory duties are violated, courts may also act pursuant to the Declaratory Judgment Act, including as an alternative or in addition to granting mandamus relief.

159.    All DOGE hearings must be noticed in advance in the Federal Register; by conducting and continuing to conduct hearings without notice, Defendants have violated and will continue to violate § 10(a)(2) of FACA.

160.    All meetings of DOGE, including those conducted through an electronic medium, must be open to the public; by failing to grant public access to its hearings, Defendants have violated and will continue to violate §§ 10(a)(1), (3) of FACA.

161.    By not ensuring that the "membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," Defendants have violated and will continue to violate § 5(b)(2) of FACA.

162.    By failing to make any "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," Defendants have violated and will continue to violate § 5(b)(3) of FACA.

163.    By undertaking hearings prior to filing an advisory committee charter, Defendants have violated and will continue to violate § 9(c) of FACA.

164.    By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" DOGE, Defendants have violated and will continue to violate § 10(b) of FACA.

165.    By failing to make transcripts of each DOGE hearing available, Defendants have violated and will continue to violate § 11 of FACA.

166.    Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the foregoing conduct violates FACA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in its favor and against Defendants, and:

(1)    Declare that Defendant Department of Government Efficiency is separate and distinct from the U.S. DOGE Service and is an advisory committee subject to the requirements of the Federal Advisory Committee Act;

(2)    Declare that Defendants have violated FACA by (1) failing to ensure that DOGE's membership is fairly balanced and without undue influence; (2) failing to file an advisory committee charter with all required entities; (3) failing to appoint necessary officers for oversight; (4) failing to provide members of the public with timely notice of DOGE's hearings; and (5) failing to make agendas, minutes, transcripts, witness bios, and other record evidence available to the public;

(3)     Declare that DOGE is not properly constituted and any report or recommendation does not reflect the views of a lawfully constituted advisory committee;

(4)     Permanently enjoin Defendants DOGE and Musk, and all of DOGE's subunits, from holding further meetings, sessions, or hearings, or conducting any official business whatsoever on behalf of DOGE, whether remotely or in person;

(5)     Permanently enjoin Defendants from submitting, accepting, publishing, employing, or relying upon any report or recommendations produced by DOGE for any official purpose whatsoever, directly or indirectly;

(6)     Award reasonable costs and attorneys' fees as provided in 28 U.S.C. § 2412(d) or any other applicable law;

(7)     Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(8)     Grant such other relief as the Court may deem just and proper.

Date:   February 13, 2025

Respectfully submitted,


/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD  20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*